JOURNAL ENTRY and OPINION
{¶ 1} Plaintiff, the State of Ohio (the "State"), appeals the trial court's order conditionally releasing defendant from a fully secured mental health facility, the Northcoast Behavioral Healthcare ("Northcoast") facility, to Bridgeway, Inc., a 24-hour supervised residential group home.
 {¶ 2} In 1977, defendant was found not guilty by reason of insanity in the 1974 shooting death of a Cleveland police officer.[1] For almost thirty years, defendant has been hospitalized in various supervised mental health facilities, including Northcoast for the past three years.
 {¶ 3} In February 2005, Dr. Stephen Noffsinger, the Chief Clinical Officer of Forensics at Northcoast, reported to the trial court that defendant was ready for conditional release to a 24-hour supervised group home. Dr. Joy Stankowski, defendant's treating psychiatrist at Northcoast, and Dr. Aileen Hernandez, a psychiatrist with the Court Psychiatric Clinic, concurred with Noffsinger's recommendation.
 {¶ 4} In June 2005, the trial court held an evidentiary hearing to determine whether defendant should be conditionally released to Bridgeway, as urged by Northcoast. Opposing defendant's release, the State argued that he remains a threat to the public's safety and welfare.
 {¶ 5} The trial court granted the request for defendant's conditional release to Bridgeway. This appeal followed, in which the State presents the following single assignment of error:
THE COURT ERRED IN GRANTING A CHANGE IN PLACEMENT FOR APPELLEE TO RESIDE IN A 24-HOUR GROUP HOME.
 {¶ 6} The State argues that the trial court abused its discretion in ordering defendant's conditional release to what it describes as a "non-secure 24-hour group home where he would have unsupervised access to the community." State's Brief on Appeal, p. 2.
 {¶ 7} R.C. 2945.401 et seq. governs a defendant's change in placement from one mental health facility or program to another. Upon recommendation from "the chief clinical officer of a hospital, program, or facility, the trial court may approve, disapprove, or modify the recommendation" to change a defendant's placement. R.C. 2945.401(I).
 {¶ 8} The statute requires the trial court to conduct a hearing in which the state has the initial burden of proving that a change to a less restrictive status for a defendant would, "by clear and convincing evidence," pose "a threat to public safety or a threat to the safety of any person." R.C. 2945.401(G)(2).
"Clear and convincing evidence" is more than a mere preponderance of the evidence. Rather, it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. In reAdoption of Holcomb (1985), 18 Ohio St.3d 361, 368,481 N.E.2d 613; Cross v. Ledford (1954), 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus. In reviewing weight of the evidence arguments where the plaintiff's burden below is clear and convincing evidence, an appellate court will not reverse judgments supported by some competent, credible evidence going to all the essential elements of the case. State v. Schiebel
(1990), 55 Ohio St.3d 71, 74-75, 564 N.E.2d 54; In reStackhouse, 1991 Ohio App. LEXIS 1175 (March 11, 1991), Athens App. No. 1456, unreported.
State v. Mahaffey (2000), 140 Ohio App.3d 396, 401-402, 2000-Ohio-1940, 747 N.E.2d 872; State v. Hubbard, (Nov. 5, 1999), Trumbull App. No. 97-T-0144, unreported.
 {¶ 9} At a hearing held pursuant to R.C. 2945.401, the trial court is required to consider the factors listed in R.C.2945.401(E), which states:
In making a determination under this section regarding nonsecured status or termination of commitment, the trial court shall consider all relevant factors, including, but not limited to, all of the following:
(1) Whether, in the trial court's view, the defendant or person currently represents a substantial risk of physical harm to the defendant or person or others;
(2) Psychiatric and medical testimony as to the current mental and physical condition of the defendant or person;
(3) Whether the defendant or person has insight into the defendant's or person's condition so that the defendant or person will continue treatment as prescribed or seek professional assistance as needed;
(4) The grounds upon which the state relies for the proposed commitment;
(5) Any past history that is relevant to establish the defendant's or person's degree of conformity to the laws, rules, regulations, and values of society;
(6) If there is evidence that the defendant's or person's mental illness is in a state of remission, the medically suggested cause and degree of the remission and the probability that the defendant or person will continue treatment to maintain the remissive state of the defendant's or person's illness should the defendant's or person's commitment conditions be altered.
State v. Bowen (2000), 139 Ohio App.3d 41, 45,742 N.E.2d 1166.
 {¶ 10} In the case at bar, the State argues that it presented clear and convincing evidence that defendant is still a threat to the public and, therefore, the court erred in ordering him to the less restrictive environment at Bridgeway.[2] We do not agree.
 {¶ 11} At the hearing, the State presented three witnesses. Its first witness was Dr. Joy Stankowski, defendant's treating psychiatrist at Northcoast. Dr. Stankowski recounted defendant's
 {¶ 12} psychiatric history. Defendant developed persecutory delusions as a teenager. At approximately age 22, when defendant shot and killed the police officer in 1974, he feared that he was being chased and hid in a park to protect himself. When the officer approached, defendant shot him in what he thought was self-defense.
 {¶ 13} For the past thirty years, defendant has resided and been treated at a number of mental health facilities. Dr. Stankowski acknowledged defendant's history of extreme dangerousness and her initial recommendation not to transfer defendant, a recommendation made just months before her appearance in court. In that first report,[3] Dr. Stankowski explained she did not recommend transferring defendant out of Northcoast because there was no release program yet available to him.
 {¶ 14} Dr. Stankowski further explained that the second report[4] recommending defendant's conditional release, was written after she learned that a conditional release program had become available. Because of this new location, Dr. Stankowski recommended his release based upon the risk assessment process she and others conducted. She explained this process as follows:
A: That's something actually the treatment team continuously looked at in the case of Mr. Roden because his crime was violent, and the way the team approached the risk assessment was to look at his chronic background risk, so he has a risky history and that will never change, but to compare that to what's going on at present to see what is Mr. Roden's acute or current risk of harming someone else, and the treatment team weighed that.
So, although there were some risk factors for Mr. Roden, given his history of violence and given the fact that he suffers from a severe mental illness and needs to be on medication, the team looked at the fact that Mr. Roden has not had any instances of violence in the recent past at all, has not required medication to calm him, has not required seclusion, has not required restraints, has not attempted to flee the hospital, and, in fact, has enjoyed the privileges, which have included working off of the unit, attending functions in the community, all without difficulty.
And when the team weighed the chronic risk factors of the mental illness and the past history of violence with the present absence of risk factors, the team concluded that at this time there's no sign of any acute risk of dangerousness.
Q: All right. You mentioned, I think on direct examination, that he has insight into his illness, is that a fair statement?
A: Yes.
Q: And having insight into his illness would then increase, would it not, Doctor, the likelihood that he will continue to take his medication?
A: Yes.
Tr. 37-38.
 {¶ 15} Dr. Stankowski stated that as long as defendant remains on his medication he is fine and does not pose a threat to anyone. Defendant has remained on his medication without incident for years. As a result of his compliance with his drug regimen, defendant has had unsupervised privileges which he has not abused except for one incident in the 1980's when he did go off-site without permission. Defendant does not use drugs or alcohol.
 {¶ 16} Since 2003, defendant has continued his employment doing maintenance at Northcoast. Defendant has also continuously mastered daily living activities such as personal hygiene, dressing himself, and voluntarily taking his daily medications. According to Dr. Stankowski, the least restrictive setting for defendant would be a conditional release to a supervised group home.
 {¶ 17} The State's next witness was Mary Sherman El-Eter of Bridgeway, a community mental health center, who recommended defendant be transferred from Northcoast. The facility is supervised twenty-four hours a day, seven days a week; the sixteen residents there have their own keys to the facility. The residents can come and go as they please so long as they sign in and out. Residents are continuously monitored to be sure they are taking their medications. Should any Bridgeway resident not comply, the facility has direct contact with the court for immediately reporting such incidents. El-Eter answered the following questions about defendant:
Q: And you've basically interviewed him, have you not?
A: Yes, I did.
Q: And do you have an opinion as to whether or not he's a likely success story for your particular residential community?
A: Yes. I asked him about his running away. I said, "You left in the 80's. What happened? How come you didn't leave this time? You've been here for two years. You haven't left. You've been really quite good. What happened?
He said, "Well, I want to leave the right way," he told me.
I asked him about guns. I said, "Do you use guns? "I don't want guns. Guns is what got me in here in the first place. I did wrong. I don't want to do this."
I upped the ante. "Well, what about knives, Mr. Roden?
"No. I don't want to do anything that would hurt anyone or get me in trouble."
So he has a long-standing, from what I could read and what I could interpret, a long-standing history of being compliant with medication, understanding and remorse.
And I pushed him around pretty much, and he maintained his composure, and given what I've been doing for 16 years, he seemed like — Mr. Roden, you seemed like you would be a fine candidate for conditional release.
Tr. 59-60.
 {¶ 18} Dr. Aileen Hernandez, a forensic psychiatrist from the Court Psychiatric Clinic was the State's third witness. Besides her employment at the Court Psychiatric Clinic, Dr. Hernandez also works as a forensic psychiatrist at Recovery Resources, an outpatient psychiatric treatment facility for persons found not guilty by reason of insanity and those determined to be incompetent to stand trial.
 {¶ 19} Dr. Hernandez explained that she evaluated defendant after Northcoast's recommendation for his conditional release.[5] As part of her evaluation, Dr. Hernandez reviewed thirty-one years of defendant's hospital records and concluded that defendant suffers from paranoid schizophrenia, which has been in remission for years. Dr. Hernandez acknowledged that should defendant stop taking his medications, he would likely risk having a recurrence of his schizophrenic symptoms and thus becoming dangerous to others. That is why Dr. Hernandez recommends that defendant remain on medication for the rest of his life.
 {¶ 20} Dr. Hernandez underscored that defendant understands that he requires "chronic treatment" for his condition and that he will, therefore, always need to be on medication. According to Dr. Hernandez, defendant has never refused his medication. Moreover, since 1995, defendant has had off-grounds privileges at the facilities where he was hospitalized and he has never left either facility without proper authorization. To a reasonable degree of medical certainty, Dr. Hernandez recommended that defendant be conditionally released into the community.
 {¶ 21} The State, however, urges this court to reverse the judgment of the trial court. The State argues that, because Bridgeway is located near the West side of Cleveland in a quasi-residential area, defendant will have unsupervised access to the community including stores and bars.
 {¶ 22} During Dr. Stankowski's testimony, the State referred to a 1990 report by Dr. Donald Gold Jr., a psychologist with the Ohio Department of Mental Health. When Dr. Stankowski was asked whether she had ever seen the report, defense counsel objected and made the following comments:
Q: Okay. I'm going to show you the report.
Did you review this report, and do you know that the doctor there notes that Mr. Roden is actively psychotic and is considered to be a dangerous individual?
A: I don't recall if I specifically saw this report or not.
MR. MOONEY: I'll mark that as Court's Exhibit 3.
(Thereupon, Court's Exhibit 3 was marked for identification purposes.)
A: Would you like me to read this?
Q: Yes. If you want to take a minute to.
MS. MOORE: Well, Your Honor, I'm going to object at this point. She did not prepare this report. She was not his treating psychiatrist back in 1990, and I think it's unfair to ask her questions about somebody else. She can state what she knows or what she doesn't know based on those questions, but for her to —
THE COURT: I agree.
MS. MOORE: Thank you.
Q: Okay. So at least the last — in this report, on that evaluation, the doctor, he noted that he was actively psychotic?
MS. MOORE: Objection again, Judge.
MR. MOONEY. Okay.
THE COURT: Sustained.
Tr. 20-21.
 {¶ 23} As shown by the record, the State never produced the author of the 1990 report to testify at the hearing. The report, therefore, is hearsay. Accordingly, the trial court correctly sustained defendant's objection.
 {¶ 24} We further reject the State's claim that Dr. Stankowski and Dr. Hernandez stated that "defendant's release to this home would pose a threat both to public safety and the safety of any person." State's Brief on Appeal, p. 3.
 {¶ 25} The record does not support the State's characterization of either psychiatrist's testimony. To the contrary, with the caveat that defendant must always remain on his medication, neither doctor opined that he would be a threat to the public or any individual.
 {¶ 26} The State further claims that because Bridgeway is in a residential area with stores selling alcohol defendant poses a threat to the community. Again, the record belies the State's suggestion. Each of the State's experts agreed that defendant is not at risk for using either alcohol or drugs.
 {¶ 27} We also reject the State's argument that, since defendant would have unsupervised access to the community, he could obtain a weapon or firearm and, therefore, be a danger to the public. Since the 1974 shooting, when he was not on his current medication, there is no evidence that defendant has used any type of weapon or firearm.
 {¶ 28} When we consider that none of the State's own witnesses recommended that defendant remain at Northcoast, we must conclude that virtually all the State's concerns about defendant's change in placement amount to mere speculation.
 {¶ 29} We reject the State's attempt to argue defendant is currently dangerous because of events in 1974. As the State should recognize, R.C. 2945.401 focuses on defendant's most recent status and the progress he has made in adjusting his conduct and attitude while he recognizes his mental illness. Were this court to follow the State's approach, no person found not guilty by reason of insanity would ever be conditionally released. Such an outcome, is contrary to the purpose of the statute, which aims to return such persons, following successful treatment, to the general community.
 {¶ 30} After consideration of the R.C. 2945.401(G) factors, we conclude that the State failed to prove by clear and convincing evidence that releasing defendant to the less restrictive environment at Bridgeway would represent a threat to the public safety or to the safety of any other person. The State's sole assignment of error, therefore, is overruled and the judgment of the trial court affirmed.
Judgment accordingly.
It is ordered that appellee recover of appellant his costs herein taxed.
The court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Sweeney, P.J., and Rocco, J., concur.
[1] Defendant was indicted for aggravated murder and felonious assault.
[2] Bridgeway is located in a residential neighborhood near W. 81st street and Franklin Ave. in the city of Cleveland.
[3] Court's Exhibit "4."
[4] Court's Exhibit "1."
[5] Pursuant to R.C. 2945.401(b), following a recommendation for conditional release, the Court Psychiatric Clinic must conduct its own independent evaluation of the person recommended for conditional release.